THE STATE OF OHIO, APPELLEE, *v.* DUDLEY, APPELLANT.

(No. 9190—Decided June 24, 1969.)

*Mr. C. Howard Johnson*, prosecuting attorney, and *Mr. David H. Bodiker*, for appellee.
*Mr. William J. Davis*, for appellant.

TROOP, J. Thomas Dudley, Jr., was indicted and tried for assault with intent to kill one Roger Breckenridge on or about September 17, 1967. The jury returned a verdict of guilty, and a judgment was entered accordingly from which this appeal is taken.

Section 2901.24, Revised Code, defines the offense, as follows:

"No person shall assault another with intent to kill ● ● ● ."

While the section does not contain words suggesting specific intent as an element of the crime, Ohio courts have held that a showing of malice is necessary for conviction under the statute.

Roger Breckenridge was a night watchman at the plant of Columbus Malleable Iron Company, and on the night of September 17, 1967, failed to make required reports to the ADT supervisory system. Investigation by an ADT officer revealed that Breckenridge was not on the plant premises and that his automobile was gone. A red cap was found on the floor of the boiler room, a later examination of which revealed bloodstains. Spots of blood were inside and outside the plant building and along the nearby sidewalk. The car belonging to Breckenridge was located, showing bloodstains outside and on the front and rear seats. A crowbar was found on the front seat of the car, stained with blood found to be the same type of blood as found on the car. Police conducted an extensive search for Breckenridge. He was not found, nor has he ever been contacted. No trace of Breckenridge, or his body, has ever appeared.

Defendant, appellant herein, details three assignments of error. The first is addressed to the testimony of a Columbus Police Officer as to the content of an "in-custody" statement made by the defendant. Counsel argues that it was error to admit the testimony because the statement was made under conditions violative of the *Miranda* rules. The other two assignments of error relate to the evidence and will be considered together. Counsel says there is "no" competent evidence to support the judgment, direct or by reasonable inference, and that there was "no" credible evidence indicating guilt beyond a reasonable doubt.

Objection was timely made when Detective Charles L. Phillips was called as a witness for the prosecution. The trial court allowed a preliminary examination of the witness, out of the presence of the jury, because counsel for

the defendant urged that the officer's testimony would reflect statements made by the defendant while in custody. A *voir dire* examination was conducted, following which the trial court admitted the testimony of the police officer. The transcript contains a record of the *voir dire* examination and the testimony of the officer in the presence of the jury.

Counsel for defendant cites, and relies upon, *Miranda* v. *Arizona* (1966), 384 U. S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A. L. R. 3d 974, and *Jackson* v. *Denno* (1964), 378 U. S. 368, 12 L. Ed. 2d 908, 84 S. Ct. 1774, 1 A. L. R. 3d 1205, in support of his assertion that the testimony of Detective Phillips was inadmissible. The Supreme Court in *Miranda* makes specific reference to its decision in *Escobedo* v. *Illinois* (1964), 378 U. S. 478, 12 L. Ed. 2d 977, 84 S. Ct. 1758, which makes it necessary to note all three cases in this discussion.

An examination of the pertinent part of the record fails to disclose that Tom Dudley, Jr., ever made a confession. He never admitted at any time an assault upon the watchman. In this respect he is totally unlike Jackson (*Denno case supra*) who, while confined in the hospital and after having been given 50 milligrams of demerol, said, "I shot the colored cop," and admitted the robbery of a hotel. Jackson made a "confession" described in the case as involuntary. Tom Dudley, Jr., made certain statements, or admission, to the police, which call for an examination of the procedure at the time of the interview applying the rules propounded in *Miranda* and *Escobedo*.

The center of interest in this examination comes on September 19, 1967, beginning shortly after noon, the watchman having disappeared sometime after 2 a. m., September 17, 1967. Following the interview, in the afternoon, the defendant accompanied police officers to Franklin Park in the city of Columbus, who went there to investigate the validity of certain statements made by the defendant during the interview. Again, on the evening of that same day, another conversation took place at police headquarters at approximately 8:45 p. m., at which time the statements of Dudley were reduced to writing. Formal charges were filed against Dudley eight days later, September 27, 1967.

This discussion is concerned with the events of September 19, and not with the matter of a lie detector test, in contemplation of which defendant was asked to sign a waiver and refused, which event took place on September 27 after charges were filed.

The character of the admissions made to Detective Phillips by Tom Dudley, Jr., deserve brief comment. They are not in the nature of a confession of guilt, but explanations of, or perhaps excuses for, certain conduct. Basically, at least, Dudley accounts for his whereabouts and relates happenings at the places where he was, of which he had knowledge. He reveals his presence at the scene of the crime, accounts for activities preceding that time, describes seeing blood spots at the scene and admits the presence of a blood spot on the knee of his trousers, and explains the burning of his trousers and tennis shoes, saying that if the blood were found he would be accused for the reason that he had been accused on the occasion of a prior incident of violence respecting another plant employee.

To discuss *Miranda* and *Escobedo* in detail is without point. General rules specifically concerned with the instant case are noted categorically, as follows:

1. "Police have power to investigate an unsolved crime by gathering information from witnesses and by other proper investigative efforts." (*Escobedo*, paragraph 8 of S. Ct. headnotes.)

2. *Miranda* speaks of custodial interrogation indicating the beginning point to be when an "individual is taken into custody or otherwise deprived of his freedom by authorities in any significant way * * *." (*Miranda*, paragraph 66 of S. Ct. headnotes.)

3. Incriminating statements of a suspect are inadmissible where "police have not effectively warned him of his absolute constitutional right to remain silent, * * *." (*Escobedo*, paragraph 7 of S. Ct. headnotes.)

4. "An accused may intelligently and knowingly waive his privilege against self-incrimination and his right to counsel either at a pretrial stage or at the trial." (*Escobedo*, paragraph 6 of S. Ct. headnotes.)

5. An accused must be informed of his right to remain silent and be told that any statement he makes may be used

against him but he may "voluntarily, knowingly and intelligently" waive the right to be silent and the right of counsel. (*Miranda*, paragraph 6 of S. Ct. headnotes.)

Eight days elapsed between the first interview Dudley had with the police and the filing of the formal charge. It must be apparent that the problem before the police officers during that period could well be labeled an "unsolved crime" when the missing watchman had not been located. It is conceded that it is difficult to determine from a written record just the point at which general inquiry moves to the specifically accusatory, but in the instant case the unusual factor of the missing watchman does much to continue the general inquiry characterization. Further support for the conclusion that the general inquiry continued beyond September 19, 1967, comes from the fact that James Cowan, characterized by his mother as "immature," was present at the scene. The presence of Cowan at the scene produces further investigative necessity because of the effort of Maynard Clinton Brown, who talked to the police "to help Thomas Dudley." Brown's testimony was that he told police officers that he had been with Dudley and Cowan at the scene, that Dudley "hadn't done it and that this boy Cowan had done it." In answer to a question, he said that he put the finger on Cowan. Cowan was questioned the first time September 27, the date upon which charges were filed against Dudley.

In the presence of such testimony it appears that the general inquiry continued to the date of the filing of formal charges; in any event, the police inquiry was clearly general as of September 19, 1967.

Thomas Dudley, Jr., was not taken into custody on September 19, 1967. Detective Phillips testified, in response to a question by defense counsel, that after two interrogations and a check of the park on September 19, the defendant was sent on home. It is clear that Dudley appeared at police headquarters voluntarily. Dudley's own testimony was that he was picked up by the police and—"They asked me if I'd come with them." Detective Phillips establishes that Dudley was sent home with his father and stepmother the evening of September 19. It is significant

that Thomas Dudley, Sr., advised his son "that the best thing for him to do, in my estimation, was to go to the Columbus Detective Bureau and discuss the whole thing."

Thomas Dudley, Jr., was not "taken into custody" or "deprived of his freedom" until September 27, 1967, and he certainly was not in custody on September 19, 1967.

Detective Phillips says that, after the accused voluntarily accompanied police officers to the headquarters and before conversation, his civil rights were explained to him and he was supplied with a paper titled, "Your Constitutional Rights." The paper, State's Exhibit 25, was handed to him to read. The detective says, "We read and he read it." The paper advises of the right to remain silent —that what is said may be used against the one who says it—and of the right to be represented. The section indicating a willingness to speak and waiving a right to counsel is signed by Thomas Dudley, Jr.

Thomas Dudley, Jr., testified that—he signed the constitutional rights statement, he realized what it was and that he could read. When told by the court that it says on the slip that he didn't have to speak, he replied, "I never even thought about that." And when asked if he understood. he said, "I imagine I did."

The accused was warned of his right to remain silent and as to the possible consequence of breaking that silence. He waived his right to be represented. There is nothing in the record to indicate that the waiver was not "voluntarily, knowingly, and intelligently" executed.

If there be any genuine question in this whole matter of advice as to rights, it concerns the waiver of the right to counsel. Detective Phillips' testimony was that he did not recall Dudley "saying or asking for an attorney at that time." This Dudley disputes, insisting that he signed the waiver with the understanding that he would get a lawyer. Two facts support the police officer. Dudley was back at headquarters eight days after the execution of the waiver, still without any attorney. He testified that he had not called an attorney during the interval, because, he said, "I figured the matter was over." The other fact bears directly on his credibility. When asked concerning

the truth of statements made to Detective Phillips, Dudley admitted that he had lied, at least in part, to the officer. Where credibility is a determinative factor, the statements of an admitted liar are subject to substantial discount.

We conclude, as did the trial court, that there is no violation of the principles laid down in *Miranda* in the instant case and that, therefore, defendant's first assignment of error is not well taken and is overruled.

In reviewing the remaining two assignments of error suggested by the defendant, there is no attempt to discuss the refinements of the supporting argument advanced by counsel. On the contrary, the approach will be to investigate what appears to be regarded by counsel as a major weakness in the state's case, the lack of a corpus deliciti, in some depth, and then to survey the total evidence supplied by testimony and exhibits, in order to evaluate the weight thereof. The problem of corpus delicti presents itself in this case because of counsel's repeated reference to the absence of a complaining witness. It seems that counsel insists that there must be a victim who shows up, swathed in bandages, and explains how he was beaten with intent to kill.

Although particularly pertinent in murder cases, text writers make it perfectly plain that corpus delicti does not mean a dead body. The reporters of the old English common law did, however, look in askance on any conviction for homicide without a body being present, and some took the extreme view that there should never be a conviction for murder or manslaughter unless a body be produced, even though there is no such common-law requirement. (See 2 Hale, Pleas of the Crown 290 [1678].) It seems apparent from much that is reported in the past, as well as some current cases, that the view that actual production of a body is a corpus delicti requirement persists in the thinking of some lawyers and of some courts. An existing Texas statute (Article 1204, P. C., Texas Statutes) is illustrative of the extreme view prevailing in some states. It reads as follows:

"No person shall be convicted of any grade of homi-

cide unless the body of the deceased, or portions of it, are found and sufficiently identified to establish the fact of the death of the person charged to have been killed."

There are decisions reported, that flatly deny the requirement of a body in murder or manslaughter cases. *United States* v. *Williams* (1858), 28 Fed. Cas. 636, reports an appeal in a case charging murder on the high seas. The court observed that a murderer would only have to consume the body by fire or decompose it by chemical means or sink it in the depth of the seas and the laws of society would be powerless to punish the offender. The court then suggests the kind and quantum of evidence required for conviction and proof of the corpus delicti, at page 643, as follows:

"* * * it may be proved by direct evidence, or where such does not exist, it may be proved by cogent circumstances, provided they are sufficient to produce conviction on the mind of the jury and to exclude every reasonable doubt. It must be so, else the laws for the punishment of felonious homicide are insufficient to reach the secret offender, provided he has the opportunity and employs the means to destroy the body."

Reference is also to a California case, *People* v. *Cullen* (1951), 37 Cal. 2d 614, 234 P. 2d 1. At page 624, the court said:

"Here the corpus delicti consists of two elements, the death of the alleged victims and the existence of some criminal agency as the cause, either or both of which may be proved circumstantially or inferentially. * * *

"It is not necessary in order to support the conviction that the bodies actually be found. * * * to require direct and positive proof of the corpus delicti would be most unreasonable; * * * the worst crimes are naturally committed at chosen times, in darkness and secrecy; * * * human tribunals must act upon such indications as the circumstances admit; * * * more often than not the attendant and surrounding facts remove all mystery and supply that degree of certainty men are daily accustomed to regard as sufficient in the most important concerns of life.

"Proof of the corpus delicti does not require identity

of the perpetrators. It is not necessary that it connect the defendant with the commission of the crime although it may do so. * * *''

A more recent case from a California District Court of Appeals is of particular interest in the instant case. It is the case of *People* v. *Scott* (1959), 176 Cal. App. 2d 458, 1 Cal. Reptr. 600. In *Scott* there was only a trace of a missing person. The wife's denture and two pairs of glasses with her exact prescription were found buried near her home. The murder conviction of her husband was upheld. Significantly—*the body was not found* and *there was no confession.*

The court, at page 490, summarizes and observes, as follows:

"In the reported cases of murder there was almost invariably proof of death consisting of (1) direct evidence of the use of the means of death upon the body of the missing person, as in some cases of death at sea, (2) production of a body or part of a body identified as that of the missing person, or (3) incriminating circumstances sufficient to prove the corpus delicti and an admission or confession of the fact of death. * * *

"There are a great many cases of the third class which without exception hold that proof of the corpus delicti plus a confession is legally sufficient. The facts of the present case, in our opinion, bring it clearly within the principle of the confession cases."

What the court pinpoints is that; first, a minimum amount of independent evidence is required to prove a corpus delicti and may be essentially circumstantial evidence, and then, the activities and actions of a defendant may be introduced and may have the same effect as a confession. The court speaks succinctly at page 496, as follows:

"* * * the circumstantial evidence of the fact of death by criminal means was as strong and convincing as a confession would have been and much stronger than a confession of questionable validity."

To avoid being submerged by doctrines concerning that category of cases when the production of a body is deemed

a requirement, we need to look to the text writers for the broader concepts relating a corpus delicti principle to other criminal offenses. Text material in 30 American Jurisprudence 2d, beginning at page 315 and Section 1140, suggests some basic rules applicable in *all* trials for crime. By way of summary of text material, the following is suggested:

1. The prosecution should first prove to a jury that a crime has been committed—"the act."

2. Until it is proved that a particular crime has been committed, it is not competent to try to show who did it—"the criminal agency of the act."

3. Where basic evidence of the circumstances of the crime and of its commission is such that it is absolutely necessary to prove the act and the agency at the same time, or abandon all such composite proof, it will establish the corpus delicti.

4. The corpus delicti may be established by circumstantial evidence where the inference of the happening of the criminal act is the only probable or natural explanation of the proved facts and circumstances.

See, also, 15 Ohio Jurisprudence 2d, beginning at page 620, Section 455, and page 683, Section 513, and *State* v. *Nevius* (1947), 147 Ohio St. 263.

This court, in *State* v. *Curtis* (1959), 83 Ohio Law Abs. 25, calls attention to this broader concept of the term corpus delicti. Two statements by the court explain its view, as follows:

" * * * 'Corpus delicti' means the body or substance of the crime. * * *"

"* * * Proof of 'corpus delicti' requires proof that a certain result has been produced, as that a man has died, or a building has been burned, or a piece of property is not in the owner's possession, and that some one is criminally responsible for the result. * * *"

Many cases dealing with the corpus delicti concept involve a confession by the accused. Quite uniformly, courts have held that there must be some independent evidence to support a statement to the police. It is not difficult to see why such a view makes it necessary to pro-

duce a "body" as "some" evidence. In the homicide cases a body provides conclusive independent evidence and commonly it is not difficult to obtain. A classic Ohio case, *State* v. *Maranda* (1916), 94 Ohio St. 364, cited and relied upon by counsel for the defendant, is pertinent to the instant review.

*Maranda* is a case in which there was a confession. The crime was arson. Basic rules and concepts are provided. Paragraph one of the syllabus says that corpus delicti includes two elements—"1. The act. 2. The criminal agency of the act." It reiterates, in paragraph two of the syllabus, the prevailing rule that there must be evidence outside the confession to establish the corpus delicti, and, as to such evidence, says:

"The *quantum* or weight of such outside or extraneous evidence is not of itself to be equal to proof beyond a reasonable doubt, nor even enough to make it a *prima facie* case. It is sufficient if there is *some* evidence outside of the confession that tends to prove *some* material element of the crime charged."

The announced basic rules found in *Maranda* bear an amazingly close resemblance to those in *People* v. *Scott, supra*, in which the court said that the minimal amount of evidence to prove a corpus delicti could be circumstantial. In *Scott* there was no confession and no body and yet the court held that it belonged in the same group as those cases in which there were "incriminating circumstances sufficient to prove the corpus delicti" and an admission or confession of the fact of death. Language employed in paragraph two of the syllabus ʾof *Maranda* is similar to that in *People* v. *Scott,* as follows:

"It has long been established as a general rule in Ohio that there must be some evidence outside of a confession, tending to establish the *corpus delicti,* before such confession is admissible. \* \* \*"

The syllabus then concludes as quoted *supra.*

The principle announced in *Scott* and *Maranda* is that there need only be *some* evidence introduced tending to prove some material element of the crime charged before any and all evidence of the acts and statements of the de-

fendant, circumstantially consistent with a theory of guilt, may be admissible in evidence.

"When there is any evidence, direct or circumstantial, tending to establish the corpus delicti, the question of its sufficiency is for the jury. The corpus delicti is required to be proved beyond a reasonable doubt, and it is for the jury to determine whether it has been so proved." (30 American Jurisprudence 2d 316, Section 1140.) The jury in this case was properly instructed as to the elements of the crime. It was directed to determine—"the act"—"the criminal agency of the act" and whether that "agency" intended to kill Roger Breckenridge.

Defendant's assignment of error insisting on the production of a body is not well taken. Under prevailing rules the corpus delicti was established. Defendant was able to see and hear all the witnesses against him. There is nothing in the applicable law that suggests that conviction for the offense charged requires confrontation by a bleeding, damaged, and bandaged complaining witness. In fact, under present day concepts, production of a "body" is not absolutely essential to convict, even in a murder case.

Consideration of the remaining assignment of error, directed to the evidence, is approached in the light of the rule in *State* v. *Sheppard* (1956), 165 Ohio St. 293, which directs that a reviewing court shall not retry the issues but "will confine its consideration to a determination of whether there is sufficient evidence to have warranted the submission of the case to the jury and whether there is sufficient substantial evidence to support the verdict rendered."

To attempt a summary of extensive evidence is always difficult. It is nonetheless so in the instant case. A careful review of the transcript and the exhibits, however, does present certain highlights bearing upon the contentions of counsel for the defendant that there is "no" competent evidence to support the judgment, and that there is "no" credible evidence to support proof beyond a reasonable doubt, and that there is insufficient evidence to present a question for the jury. The following summary avoids reference to any evidence previously noted in the discussion

on corpus delicti and attempts only to congeal certain other evidence under basic fact categories.

1. Defendant is placed at the scene of the crime by his own admissions to Officer Phillips as to the early hours of September 17. The father of the defendant, Thomas Dudley, Sr., testified that his son told him that he was at the plant the Saturday night and Sunday morning of Breckenridge's disappearance, having gone there to see Pat James.

2. The time that Breckenridge and the defendant were at the plant falls within clearly established limits. The defendant admitted that he looked at the watchman's clock between 2:30 and 2:35 a. m. Dudley, Sr., said that the tape in the watchman's clock indicated that Breckenridge had completed a round at about 2:20 a. m. A report was made to the ADT supervisory office at 2 a. m. No later report was made as required, and ADT called and tried to reach the watchman at 2:28 a. m. and then investigated directly.

3. Breckenridge was alone at the plant at the times established as significant. Thomas Dudley, Sr., a supervisory employee of Columbus Malleable, said there was no plant employee working at the time. Pat James also said that he was not working and no one was working. The defendant admitted that he called for Pat and nobody was there. State's Exhibit 3 shows that the night watchman, Breckenridge, began his tour of duty September 16 at 11:35 p. m., but never clocked out thereafter.

4. Bloodstains are the subject of much testimony. They were found in the plant, on and in the Breckenridge car, and on the red cap. The stains of greatest interest, however, are those said to have been on the pants which belonged to the defendant. The defendant admitted that there was blood on the knee of the trousers, which he said came after he hit his knee on a grinding machine in the shop. Defendant said he burned his pants and shoes at Franklin Park. He admitted that he had burned them because, he said, if they were found he would be accused as to a prior incident when a plant guard had been hit in the head. Mr. Dudley, Sr., spoke of the blood on Tom's clothes and further testified that his son's explana-

tion was that he had spilled ketchup on them at a bar. Mr. Dudley said also that Tom had mentioned that he had burned the clothes.

5. Testimony as to physical facts and certain tangible items introduced as state's exhibits, chief among which is a crowbar (State's Exhibit 23), are an important segment of the total evidence adduced. James Cowan testified that the defendant had a crowbar in his pants and took it with him when he left the Cowan home. Anderson saw the defendant with a crowbar. The entire testimony of Lloyd Shupe, police chemist, must be noted in connection with the physical evidence before the jury. Detective Baker secured samples of hair from the head of Breckenridge from his home, which matched those taken from the crowbar and those taken from the red cap which Dudley, Sr., said was the cap the watchman normally wore. Mrs. Breckenridge supplied pajama bottoms carrying a bloodstain, definitely that of her husband, which matched bloodstain samples taken from his car and from bloody areas about the plant. Incidentally, a police expert, found a complete absence of fingerprints on the watchman's car.

6. Considerable testimony moves toward establishing "the agency of the act." Some of it comes from James Cowan, described by his mother as "immature." It is, notwithstanding, admissible evidence, and the weight is for the jury. Cowan said that defendant, Tom, argued with a man and pulled a crowbar out of his pants and hit him four times. It appears that the location of Cowan at the time of the described attack may have been somewhat away from the defendant and the "man." Perhaps Cowan was a distance removed for his own protection, or to discourage involvement; in any event, when asked to identify a photo of Breckenridge (State's Exhibit 5), he said, "That's the one Tom Dudley hit." According to the testimony of Police Officer Jones, Cowan had previously selected a photo, being that of Breckenridge, out of a group of five photos of white male subjects. Anderson said that the defendant told him he was going to get this man—a night watchman. Thomas Dudley, Sr., checked at the home of Tom, Jr., as to the whereabouts of his son, making a telephone call at

about 4 a. m., after he knew what had happened at the plant, because he said that he knew "that they were going to try to incriminate Tommy in some way or another."

7. Maynard Brown refers somewhat indefinitely to a "pot" night, which could have been the night of September 16. More specifically, the defendant admitted to Detective Phillips that he purchased and "popped" two yellow jackets and drank three-quarters of a bottle of "Robitussin," a narcotic cough syrup, before going to the plant of Columbus Malleable, and that he felt dizzy when he leaned over to pick up the "ingots" after he arrived.

This Court of Appeals, then the Second District, has aptly put the proposition that must be respected in the instant case. The case is *State* v. *Butler* (1949), 57 Ohio Law Abs. 385, and the proposition is stated as follows:

"2. The links of the chain of circumstantial evidence taken alone may not be conclusive of the guilt of a defendant, but taken together they may make a case which cannot be reconciled upon the hypothesis of innocence."

The argument of counsel that there is "no" evidence in the instant case overlooks the direct evidence noted and the very reasonable inferences therefrom—such as that only a guilty man will burn his trousers to destroy an incriminating bloodstain, and that a man who got such stain from an injury sustained by striking a grinding wheel will explain it to his mother and allow the stain to be removed by washing. The total evidence is clearly sufficient to warrant submission to the jury and, when all the "links" are taken together, is not only so sufficient and substantial as to support the verdict but is so "strong and cogent" as to leave no room for a reasonable doubt.

The judgment of the trial court is affirmed, this appeal is dismissed at appellant's costs, and the cause is remanded for further proceeding according to law.

*Judgment affirmed.*

DUFFY, P. J., and STRAUSBAUGH, J., concur.

STRAUSBAUGH, J., concurring. The fourth paragraph of the syllabus should read, "In order to support a conviction of a crime, all of the elements of a crime, including whether

or not a crime has been committed, must be proved beyond a reasonable doubt.''

I concur in the fourth paragraph of the syllabus only with the understanding that the term ''corpus delicti,'' as used, means proof of the crime itself before the jury and not some elements of the crime as the term has sometimes been loosely used before the admissibility of a confession by the court during trial. In other words, it is not necessary to prove corpus delicti, as used in paragraph four of the syllabus, by evidence entirely independent and exclusive of the confession, but rather it may be established by the confession and other evidence, considered together. (30 American Jurisprudence 2d 318.)