143 N.J. Super. 35 (1976)
362 A.2d 611
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
ROBERT ZARINSKY, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued March 16, 1976.
Decided July 20, 1976.
*40 Before Judges KOLOVSKY, BISCHOFF and BOTTER.
Mr. Richard F. Plechner argued the cause for appellant.
Mr. John T. Mullaney, Jr., Assistant Prosecutor, argued the cause for respondent (Mr. James M. Coleman, Jr., Monmouth County Prosecutor, attorney).
*41 The opinion of the Court was delivered by BOTTER, J.A.D.
Defendant was convicted in a jury trial of the first degree murder of Rosemary Calandriello (hereafter Rosemary), and the mandatory sentence of life imprisonment was imposed. N.J.S.A. 2A:113-4; State v. Funicello, 60 N.J. 60 (1972), cert. den. 408 U.S. 942, 92 S.Ct. 2849, 33 L.Ed.2d 766 (1972). Defendant's motion for a new trial was denied. On this appeal defendant asserts a number of grounds for reversal of his conviction. He contends that the trial court erred in denying his pretrial motions to suppress evidence seized at his home and to dismiss the indictment on two grounds  that the statute of limitations had run and defendant was denied a speedy trial. Defendant also contends that errors were committed by the trial judge in the admission of evidence and in charging the jury on first degree murder. He contends that his conviction was against the weight of the evidence and that the verdict cannot stand in the face of the State's failure to produce the victim's body. Finding no grounds warranting reversal, we affirm.
On August 25, 1969, at about 6 P.M., Rosemary Calandriello, a 17-year-old high school student, left her home on Center Avenue in Atlantic Highlands, New Jersey, to buy milk and ice pops at two neighborhood stores. She took $2 with her and when she left she said, "I'll be right back." She was wearing a sleeveless blouse and shorts, was barefooted and carried no purse or wallet. A neighbor saw her walking down Center Avenue toward the center of town. About the same time another neighbor, Mrs. Vaughn, saw a stocky man slouched in an old, black and white Ford automobile parked near a bowling alley on Center Avenue. Shortly thereafter four boys, who were schoolmates of Rosemary, saw her riding with a stocky man, later identified as defendant, in a white Ford Galaxie with a black convertible top. She has not been seen or heard from since, and her body has never been recovered. She was promptly reported to the police as missing and they started an investigation.
*42 Defendant's identity was determined in the following manner. On August 26 Sergeant Guzzi of the Atlantic Highlands Police Department interviewed the four boys who had seen Rosemary with defendant the night before and they furnished a description of defendant and the vehicle he was driving. Both bore distinctive features. The police learned that two days before Rosemary's disappearance a man fitting defendant's description had attempted to lure two 12-year-old girls, Lydia Hardie and Robin Spangenberg, into his car in Leonardo, a town adjacent to Atlantic Highlands. While the girls were walking down the street at about 7 P.M. a man drove up in a white car with a black convertible roof. He offered them a ride and they refused. Lydia Hardie noted the license place number, CTI 109. She testified that the man was heavy-set and had long, bushy sideburns and a goatee. She had never seen him before. The girls began to return home when the man approached again. At home Lydia told her mother of the incident and her mother reported it to the police and gave them the license plate number. The girls left home a short time later and the man approached them again and offered them a ride. They refused, but a short time later he returned once more and asked, "Are you sure?" The girls replied, "We're positive," and started to run away. The man said, "What bad little girls you are for not accepting my ride," and he uttered what was described as a "weird laugh."
The police discovered that a man fitting defendant's description had also attempted to lure two 14-year-old girls into his car two weeks earlier at the bowling alley on Center Avenue. The girls were Darlene Curren and Donna Johnson. Darlene testified that the man had a chubby face, long sideburns and a goatee, and she had never seen him before. At about 7 P.M. he approached them, offered them some drinks in his car and asked Donna if she wanted to drive his car. They refused and went into the bowling alley.
Sergeant Guzzi obtained the license plate number of the car the man was driving and learned that the car was registered *43 to defendant's father, with whom defendant and his wife lived, in Linden, New Jersey. Sergeant Guzzi signed a "John Doe" complaint on August 27, 1969 charging defendant with contributing to the delinquency of Rosemary, a minor. It described defendant as "a white male, age early twenties, heavy set with a round chubby face having long bushy sideburns and well trimmed goatee operating a 1961 white Ford Galaxy Convertible." (Defendant's correct age was 28 at the time.) In the late evening of August 27 defendant was arrested at his home in Linden and the automobile was impounded. Defendant was brought to the Monmouth County Jail around midnight. The next morning the four boys identified the vehicle and it was photographed. That same day, August 28, a lineup was held in which the four girls, Donna, Darlene, Lydia and Robin, viewed defendant. Despite the fact that defendant had shaved off his goatee and sideburns after being jailed, he was identified in the lineup as the man involved in the two incidents with these girls.
The automobile was examined pursuant to a search warrant obtained on August 29. The body of the car was in poor condition, the left rear was dented and the rear window was down. There was mud underneath the car and pieces of straw, a twig and grass were found on the lower front portions of the car. In the glove compartment were bottles of beer and blackberry brandy. The police found a .22-calibre rifle shell and a blank casing under the back seat. Hairclips were found under the right front seat and a pair of blue bikini-type panties were on the left rear floor. (There was testimony that Rosemary had worn hairclips and panties of this type, but these items were not identified as actually belonging to her.) In the trunk were found a chrome-plated hatchet and a ball peen hammer with a hair fiber on its flat face. Scrapings taken from the right rear bumper and right rear taillight rim proved upon analysis to be blood.
The door and window handles on the passenger side of the vehicle had been removed and were found under the right *44 front seat. The door and window worked properly when the handles were attached, but the holding locks on these handles had been removed. Without a handle the door on the passenger's side could not be opened from the inside, but the door and window handles on the driver's side were intact.
The initial complaint against defendant was amended on August 28 to charge defendant with abduction of Rosemary for an immoral purpose. N.J.S.A. 2A:86-3. Defendant was released on bail on August 28, 1969. Thereafter, in November 1969, defendant was indicted and arrested for attempted kidnapping or enticing a child away from parents (N.J.S.A. 2A:118-2) in connection with the incident involving the two 12-year-old girls, Lydia and Robin. He was held at the Monmouth County Jail from November 22, 1969 until December 19, 1969, when he was released on bail. During this time his jailmates included Herbert L. Williams, John Gosch and Al Glover.
In December 1969 defendant was also indicted in connection with the August 9, 1969 incident involving the 14-year-old girls, Darlene and Donna. The crimes charged were an attempt to entice a child "within the age of 14 years" to leave her father or mother, contrary to N.J.S.A. 2A:118-2, and an attempt to impair the morals of a minor by offering the minor alcoholic beverages, allegedly in violation of N.J.S.A. 2A:96-3.
In March 1970 defendant was tried on the indictment involving the 12-year-old girls, but the case was dismissed by the trial judge at the close of the State's proofs. In the subsequent trial involving the 14-year-old girls, defendant was convicted of attempting to commit the alleged crimes. However, on appeal, this court in February 1971 set aside the convictions on the ground that the proofs did not support the charges. In the meantime, in June 1970, the complaint charging abduction of Rosemary was dismissed by the trial court on defendant's motion pursuant to R. 3:25-3 for unnecessary delay in presenting the charge to a grand jury. A *45 consent order was also entered returning the impounded vehicle to defendant's father.
Although no charges were pending after June 1970, investigations involving defendant continued. Warrants were issued in February 1975 for the search of defendant's residence and vehicles, supported by affidavits asserting that defendant was a suspect in the deaths of Rosemary and of 17-year-old Linda Balabanow in 1969, and teenagers Joanne Delardo and Doreen Carlucci in December 1974. Linda Balabanow had worked at a drug store two blocks from defendant's home. She was last seen when she left the store on March 26, 1969, and her body, to which an eight-foot truck tire chain was attached, was recovered from the Raritan River in Woodbridge Township on April 27, 1969. She had been brutally beaten and was killed before her body entered the water. A piece of electrical wire was found knotted around her broken neck. In January 1972 Sergeant Guzzi was advised that federal authorities had matched a hair sample from the Balabanow girl with the hair fiber found on the ball peen hammer taken from the trunk of defendant's car in the investigation of Rosemary's death.
Similarities were noted between the death of the Balabanow girl and the deaths of the Delardo and Carlucci girls of Woodbridge Township, who were together when last seen alive on December 13, 1974. Their bodies were found on December 27 in Manalapan Township. Both girls had been strangled, and knotted electrical wire was found on Joanne Delardo's neck. The Balabanow and Delardo bodies were nude from the waist down, and Carlucci's body was almost entirely nude. Their missing clothing was never found. The preserved state of Delardo's and Carlucci's bodies led police to suspect that they had been stored in cool temperature for more than a week before being deposited in Manalapan. Defendant had an insulated truck which he and his father used in their produce business which could have been used for this purpose. However, the searches conducted on February *46 21, 1975 for evidence of these crimes were not productive so far as the record before us shows.
On February 20, 1975 defendant was indicted for the murder of Rosemary Calandriello. His pretrial motions to dismiss the indictment for untimeliness were denied, and his motion to suppress evidence seized in the February 1975 searches was also denied. Trial commenced on April 7, 1975.
As indicated above, the evidence offered by the State probative of defendant's guilt was largely circumstantial. There was extensive evidence linking defendant to Rosemary's disappearance. Two of the girls testified to the August 9 and August 23 incidents in which defendant tried to entice them into his automobile and they made positive in-court identifications of defendant. The four boys who observed Rosemary in defendant's car when she was last seen also testified and made positive in-court identifications of defendant. Theirs was not merely casual observations of Rosemary and defendant. They were approaching the intersection of Center Avenue and Avenue A in Atlantic Highlands when they observed defendant's automobile coming toward them. The vehicle turned left in front of them and they followed it at a slow pace for about five minutes. Each testified that he was able to get a good view of Rosemary and defendant, and one estimated he had a front view of defendant's face for 10 to 12 seconds. They were surprised to see Rosemary in defendant's automobile, for Rosemary had no boyfriends to their knowledge.
There was much evidence to show that it was out of character for Rosemary to be in a stranger's car. She was a shy, quiet and obedient girl who got along well at home and was never known to have hitchhiked. Rosemary had gone out with one boy several times, beginning in July 1969, but only on a double date. There was no evidence offered to suggest that Rosemary had voluntarily run away from home, yet she was never seen or heard from after riding in defendant's car. By stipulation it was proved that the following government agencies had no contact with Rosemary since August *47 25, 1969: the Social Security Administration, Internal Revenue Service, United States Post Office, Atlantic Highlands Board of Health, New Jersey Division of Motor Vehicles and New Jersey Unemployment Bureau.
Finally, three of defendant's jailmates, John Gosch, Herbert L. Williams and Al Glover, testified to statements made by defendant while in the Monmouth County Jail. Defendant implicated himself in Rosemary's murder in talking with Gosch (saying, "They'll never find that stinking broad") and, in an angry outburst, defendant admitted to Williams and Glover that he had thrown Rosemary's body, loaded with weights, into a river. Williams also testified that defendant alluded to various details of the case. Defendant explained that the inside door handles of his car were removed so that girls could not get out, and he said that he could claim that a pair of panties, found by the police in his car, were his wife's. There was also evidence that shortly before his arrest defendant was observed leaning over the open trunk of the Ford automobile with a scrub brush in his hand and a plastic pail beside him. Despite this suggestion that defendant was cleaning a portion of the vehicle, it was found generally in an unclean and untidy condition.
Defendant did not testify. Various witnesses, including his wife, mother and father and several aunts and uncles, testified that defendant was at home in Linden, New Jersey throughout the evening of August 25, 1969. However, the State was able to contradict the testimony of defendant's wife, mother and father. Defendant's father claimed he had been watching television during the evening and defendant's wife claimed she was at home. However, when questioned the day after defendant's arrest his father had said nothing about watching television; rather, he told the police he went to sleep at 5:30 P.M. At the same time defendant's mother had stated that defendant's wife had accompanied her to her weekly bingo game on the night of Rosemary's disappearance.
*48 The defense also attempted to counter the State's evidence in other respects. Defendant's wife explained that the handles in the car had been removed in an effort to repair a jammed window, that defendant was never able to install them securely and, therefore, they were kept under the seat. She also testified that the blue panties found in the car were hers, as were the hair clips. An explanation was also offered for the blood on the rear of the car: the brother of defendant's wife attempted to repair the taillight three weeks earlier and had cut his hand.
Despite this testimony the jury found defendant guilty.

I
We consider, first, whether defendant's prosecution is barred by N.J.S.A. 2A:159-2. That provision states:
Except as otherwise expressly provided by law no person shall be prosecuted, tried or punished for any offense not punishable with death, unless the indictment therefor shall be found within five years from the time of committing the offense or incurring the fine of forfeiture. This section shall not apply to any person fleeing from justice. [Emphasis supplied]
Defendant argues that because the death penalty can no longer be imposed under our existing statutes (State v. Funicello, supra) he was not accused of a crime "punishable with death." Therefore, he reasons, this prosecution must be barred because it was not instituted within five years from the time of the offense.
Defendant places primary reliance on State v. Johnson, 61 N.J. 351 (1972), which held that subsequent to Funicello an individual charged with first degree murder was bailable before conviction because murder was no longer a capital offense. However, we do not find Johnson persuasive on the issue before us. In Johnson the court was concerned with the right to bail. N.J. Const. (1947), Art. I, par. 11, provides that all persons are entitled to bail before conviction "except for capital offenses when the proof is evident or presumption great." Capital offenses are those *49 for which the death penalty may be imposed. State v. Johnson, supra, 61 N.J. at 355; State v. Williams, 30 N.J. 105, 125 (1959).
The court in Johnson examined the policies underlying the right to bail. Noting that the concept of pretrial release reflects "the everpresent presumption of innocence," the court said that the inclusion of the words "except for capital offenses" struck a balance:
The underlying motive for denying bail in capital cases was to secure the accused's presence at the trial. In a choice between hazarding his life before a jury and forfeiting his or his sureties' property, the framers * * * felt that an accused would probably prefer the latter. But when life was not at stake and consequently the strong flight-urge was not present, the framers obviously regarded the right to bail as imperatively present. [61 N.J. at 360]
Once the threat of death and its strong inducement for flight were removed the court found that there was no longer any justification for denying bail to persons accused of crimes which had been designated by the Legislature as capital offenses.
A statute of limitations strikes a balance between the right of the accused to repose and the right of the public to the prosecution of crimes. It affords protection against charges brought after events have become clouded by time, "to minimize the danger of official punishment because of acts in the far-distant past." Toussie v. United States, 397 U.S. 112, 114-115, 90 S.Ct. 858, 860, 25 L.Ed.2d 156, 161 (1970). For most crimes there is an absolute bar to prosecution after a specified period. In re Pillo, 11 N.J. 8, 18 (1952); Moore v. State, 43 N.J.L. 203, 209 (E. & A. 1881). However, the Legislature made an exception for crimes "punishable with death." These extremely serious crimes were never to be insulated by time.
Since it was enacted in 1796 our statute of limitations has excepted the crime of murder for which the legislature prescribed the death penalty. Pat. L. 1796, p. 208, § 73 (An Act for the punishment of crimes); L. 1879, c. CI, § 1 at 183; L. 1898 c. 237, § 152 at 919; L. 1953, c. 204, § 1 (N.J.S.A. 2A:159-2). (The unlimited time in which *50 to prosecute murder was extended in 1898 to all crimes "punishable by death," except for treason. L. 1898, c. 237, § 152.) Thus, throughout our history the legislature has pursued two sanctions for first degree murder: (1) that its perpetrator may suffer the death penalty and (2) that the crime would not go unpunished because of the lapse of time between the murder and the indictment.
While a statute of limitations should be liberally interpreted in favor of repose, its application must be consonant with the intent and purpose of the lawgiver. It is the legislative purpose which controls. State v. Brown, 22 N.J. 405, 415-416 (1956). Clearly, the Legislature intended to ensure that crimes of the most serious class, including first degree murder, would not escape prosecution by the mere passage of time. The phrase "offense * * * punishable with death" was a convenient means of identifying the several offenses to be included in the exception for which the death penalty was or would be provided in other sections of the criminal code. See N.J.S.A. 2A:113-2 and N.J.S.A. 2A:113-4 (first degree murder); N.J.S.A. 2A:118-1 (kidnapping for ransom); N.J.S.A. 2A:148-6 (assault with intent to kill the President, a state governor or other high executive officers) and N.J.S.A. 2A:148-1 (treason; but note the three-year statute of limitations for treason in N.J.S.A. 2A:159-1). The fact that the death penalty cannot be carried out, for constitutional reasons, does not change this identification and purpose. Unlike Johnson, the elimination of the death penalty has not affected the reason for prosecuting these crimes without time restriction. Their heinous nature remains.
The unenforceability of the death penalty has not wiped the statute off the books. See Dwyer v. Volmar Trucking Corp., 105 N.J.L. 518, 520 (Sup. Ct. 1929). Imposition of the death penalty for murder is not prohibited per se, but the criteria for its application may render the penalty unenforceable. See Gregg v. Georgia, ___ U.S. ___, 96 S.Ct. 2909, 48 L.Ed. 2d ___, 44 U.S.L.W. 5230 (1976). The constitutional basis for suspending the *51 application of the death penalty  to avoid an excessive, inappropriate or cruel and inhuman punishment or its arbitrary and capricious application (see id.)  are unrelated to the purposes of our statute of limitations. It is one thing to suspend the imposition of the death penalty for constitutional reasons, but this affords no reason for frustrating the legislative will by staying its additional sanction against murder, namely, the relentless prosecution of that crime without limitation in time. Thus, we conclude that N.J.S.A. 2A:159-2 does not bar this prosecution.[1]

II
Defendant next contends that his right to a speedy trial, protected by the Sixth Amendment to the United States Constitution,[2] was violated. A 5 1/2-year period separated defendant's arrest for contributing to the delinquency of Rosemary Calandriello and his indictment for her murder. Nevertheless, in the circumstances of this case, we hold that defendant's right to a speedy trial was not violated.
In reaching this decision we have considered the various factors referred to in Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), and State v. Szima, 70 N.J. 196, 358 A.2d 773 (1976). These are the length of delay, the reason for delay, whether defendant asserted the right and the degree of prejudice to defendant.
*52 The State offers a reasonable explanation for the delay in this case. Because Rosemary's body was never found the State was forced to prove her death by circumstantial evidence. In order to do this convincingly it was necessary to allow time to pass so that a jury could reasonably infer that she had not merely run away. Moreover, it was not unreasonable for the State to hope that more positive evidence would be found before trying defendant for this ultimate crime.
Defendant was first arrested in connection with Rosemary's disappearance in August 1969, but charges of abduction were dropped in June 1970. He was released on bail promptly after his arrest in August 1969. He has not demonstrated that prior to his indictment for murder his employment was interrupted, his finances drained, his associations curtailed, his reputation impaired, or that he, his family and friends were subjected to anxiety by reason of the threat of prosecution for murder. These considerations were identified in United States v. Marion, 404 U.S. 307, 320, 92 S.Ct. 455, 463, 30 L.Ed.2d 468, 478 (1971), as the "substantial underpinnings" of the right to speedy trial. Cf. State v. Smith, 131 N.J. Super. 354, 369 (App. Div. 1974), aff'd o.b. 70 N.J. 213 (May 17, 1976); United States v. MacDonald, 531 F.2d 196 (4 Cir.1976).
Prejudice to a defense due to inordinate delay in prosecution is, of course, a serious consideration. However, we find no reason on this account to invalidate defendant's conviction. There is nothing in the record to indicate that his defense was unduly impaired. See Barker v. Wingo, supra, 407 U.S. at 532, 92 S.Ct. at 2193, 33 L.Ed.2d at 118. Defendant's alibi witnesses testified they had a clear memory that defendant was home on the night in question. See id. at 532, 92 S.Ct. at 2193, 33 L.Ed. at 118. The original, early charge of abduction had served to stimulate defendant's preparation of a defense against criminal involvement with Rosemary. Thus, defendant's claim of possible prejudice is "insubstantial" and "speculative." *53 United States v. Ewell, 383 U.S. 116, 122, 86 S.Ct. 773, 777, 15 L.Ed.2d 627, 632 (1966); cf. United States v. Mann, 291 F. Supp. 268 (S.D.N.Y. 1968) (cited with approval in Barker v. Wingo, supra).
Defendant contends that he was prejudiced by reason of the death of his first attorney, Morris Spritzer, whose testimony would have been helpful on the voir dire as to the admissibility of the lineup evidence. The record shows that Spritzer represented defendant in an application for reduction of bail on November 24, 1969 in connection with the indictment pertaining to the 12-year-old girls. Shortly thereafter, on December 11, 1969, defendant's present attorney appeared for defendant in that cause and he has continued to represent defendant on all charges involving Rosemary and the four other young girls. Defendant contends that he was deprived of his right to Spritzer's counsel at the August 28, 1969 lineup identification. However, for reasons indicated below, we conclude that the loss of Spritzer's testimony was immaterial, since the denial of defendant's right to counsel, even if it occurred, was harmless error.
We also find no prejudice in the loss of other potential evidence claimed by defendant. For example, the Ford Galaxie, which was ordered returned to defendant's father in May, 1970, was destroyed in April 1973 as valueless. However, photographs of the vehicle were taken in August 1969 and were marked in evidence at the trial. The car was available to defendant before the charge of abducting Rosemary had been dismissed, and defendant has not shown what proof he lost by its unavailability at the time of trial.
Defendant contends that his motion for dismissal of the charges against him for Rosemary's abduction was tantamount to a request for speedy trial.[3]Cf. State v. Smith, *54 supra, 131 N.J. Super, at 363-367. Nevertheless, viewing the record as a whole, we have no doubt that defendant suffered no constitutional wrong by the passage of time before he was indicted for murder.

III
We reject, also, defendant's contentions that the trial judge committed prejudicial error in admitting certain evidence.
We find no error in the judge's refusal to exclude defendant's admissions of culpability to Gosch, Williams and Glover. For a confession to serve as an evidential basis for conviction "the State must introduce independent proof of facts and circumstances which strengthen or bolster the confession and tend to generate a belief in its trustworthiness, plus independent proof of loss or injury * * *." State v. Lucas, 30 N.J. 37, 56 (1959). We find that the State has met this burden.
There was ample independent circumstantial proof to give credence to defendant's admissions. The failure to produce the victim's body does not preclude a finding that she is dead. Commonwealth v. Burns, 409 Pa. 619, 629-33, 187 A.2d 552, 558-559 (Sup. Ct. 1963); State v. Dudley, 19 Ohio App.2d 14, 20, 249 N.E.2d 536, 541 (Ct. App. 1969). Proof of the corpus delicti  the fact of injury or, in a homicide case, of death, by a criminal agency  may be supplied by direct or circumstantial evidence. Commonwealth v. Burns, supra; State v. Dudley, supra; Campbell v. People, 159 Ill. 9, 42 N.E. 123 (Sup. Ct. 1895) (miscited by defendant as support for his position); People v. Corrales, 34 Cal.2d 426, 210 P.2d 843 (Sup. Ct. 1949); cf. United States v. Di Orio, 150 F.2d 938, 941 (3 Cir.), cert. den. 326 U.S. 771, 66 S.Ct. 175, 90 L.Ed. 465 (1945). Contra, Ruloff v. People, 18 N.Y. 179 (Ct. App. 1858), cited by defendant, and N.Y. Penal Law of 1909, § 1041. But L. 1965, c. 1046, § 2, effective Sept. 1, 1967 (N.Y. Penal Code *55 § 500.05 (McKinney 1967)), repealed the 1909 statute. New York law now bars a conviction based solely on a confession unless there is "additional proof that the offense charged has been committed." N.Y. Crim. Proc. L. § 60.50 (L. 1970, c. 996, § 1, effective Sept. 1, 1971). See People v. Jennings, 40 A.D.2d 357, 340 N.Y.S.2d 25 (App. Div.), aff'd o.b. 33 N.Y.2d 880, 352 N.Y.S. 444, 307 N.E.2d 561 (Ct. App. 1973); cf. People v. Daniels, 37 N.Y.2d 624, 376 N.Y.S.2d 436, 339 N.E.2d 139 (Ct. App. 1975). Surely, the successful concealment or destruction of the victim's body should not preclude prosecution of his or her killer where proof of guilt can be established beyond a reasonable doubt. Campbell v. People, supra, 159 Ill. at 22, 42 N.E. at 127.
Contrary to defendant's contention, a voir dire to determine the existence of corroboration is not a condition precedent to the admission of a confession. If sufficient independent corroboration is not shown by all the proofs, a judgment of acquittal at the close of the State's case is the appropriate remedy. R. 3:18-1.
Defendant next contends the trial judge erred in admitting the testimony of Lydia Hardie and Darlene Curren as to defendant's attempts to entice them into his car. We disagree.
Evid. R. 55 provides:
Subject to Rule 47, evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his disposition to commit crime or civil wrong as the basis for an inference that he committed a crime or civil wrong on another specified occasion but, subject to Rule 48, such evidence is admissible to prove some other fact in issue including motive, intent, plan, knowledge, identity, or absence of mistake or accident.
The fundamental distinction is between evidence which is relevant only to a defendant's "criminal disposition" and that which is relevant to a particular fact in issue before the jury. State v. Wright, 66 N.J. 466 (1975), adopting dissenting opinion, 132 N.J. Super. 130, 148 (App. Div. *56 1974). Evidence of defendant's prior conduct may be admitted if relevant to establish intent, plan or motive (see State v. Sinnott, 24 N.J. 408, 413-414 (1957)) even though defendant had been acquitted previously of criminal charges based upon such conduct. State v. Slocum, 130 N.J. Super. 358, 363 (App. Div. 1974). Conduct which is insufficient to establish a criminal intent toward one victim may tend to prove a criminal intent toward another victim in the light of other evidence.
Defendant contends that the State's failure to prove that his prior conduct was a crime or civil wrong prevents admission of this evidence. This contention misses the point. If the prior conduct is not a crime or civil wrong, but is relevant it is admissible. Evid. R. 7(f) provides that "all relevant evidence is admissible" unless excluded under some other rule of evidence. Here we find no abuse of discretion in the failure to exclude this evidence under Evid. R. 4 because of its potential for prejudice.
In this case evidence that defendant, a 28-year-old married man, had on two previous occasions persistently tried to lure teenage girls into his car would tend to explain how Rosemary came to be in the car of this stranger. See State v. Wright, supra. It tends to negate other hypotheses advanced by defendant for Rosemary's disappearance, namely, voluntary flight, suicide or accident.
We also agree with the trial judge's observation that the evidence was relevant to show defendant's presence in the victim's neighborhood, despite his residence in another county, and it tended to corroborate the identification of defendant as the driver of the automobile.[4]
*57 Similarly, we reject defendant's argument that admission into evidence of the out-of-court identifications of defendant by Lydia Hardie and Darlene Curren was reversible error. The identification of defendant as the man who tried to lure the girls into his automobile was made at a lineup on August 28, 1969, one day after defendant was arrested in connection with Rosemary Calandriello's disappearance. There is no absolute right to counsel at a pre-indictment lineup. Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972); State v. Earle, 60 N.J. 550, 552 (1972). Defendant argues, however, that because the police knew he had retained counsel and held the lineup out of counsel's presence, the identifications were inadmissible. See State v. Wilbely, 112 N.J. Super. 216, 219 (App. Div. 1970).
At the voir dire held to determine the admissibility of this evidence there was testimony that the police did notify counsel that the lineup would be held, but that he did not appear in time. Counsel was dead at the time of this trial and no explanation was given for his absence from the lineup.[5] In any case, both witnesses made positive in-court identifications of defendant, which are not challenged by defendant. Thus, even if there was error, we are satisfied beyond a reasonable doubt that introduction of this evidence was not "clearly capable of producing an unjust result." R. 2:10-2; Chapman v. California, 386 U.S. 18, 23-24, 87 S.Ct. 824, 827-828, 17 L.Ed.2d 705, 710 (1967); State v. Macon, 57 N.J. 325, 336-341 (1971).
Further, the trial judge did not err in permitting in-court identifications of defendant by the four witnesses who saw Rosemary in defendant's automobile. The judge had previously ruled that their identifications of defendant's *58 photograph should not be presented to the jury because the State had failed to properly preserve evidence of the photographic identification. See State v. Brown, 99 N.J. Super. 22, 27-28 (App. Div.), certif. den. 51 N.J. 468 (1968). However, there is nothing in the record to support defendant's contention that the procedure was impermissibly suggestive. On the contrary, the uncontradicted testimony was that each witness was independently shown seven photographs and asked if he could identify the driver of the automobile.
Assuming, arguendo, there was suggestiveness in the procedure, it was clear that the boys had ample opportunity to observe defendant. Thus, we have no doubt that the trial court correctly concluded that these in-court identifications were based upon their independent recollections. See Simmons v. United States, 390 U.S. 377, 384-386, 88 S.Ct. 967, 971-72, 19 L.Ed.2d 1247, 1253-1254 (1968); State v. Thompson, 59 N.J. 396, 418-419 (1971); cf. Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).
We find no error in admitting into evidence various items seized from defendant's automobile which offered circumstantial evidence of the commission of the crime, although the probative weight of many items was debatable. State v. Wade, 89 N.J. Super. 139, 145 (App. Div. 1965); cf. State v. Mayberry, 52 N.J. 413, 435-436 (1968), cert. den. 393 U.S. 1043, 89 S.Ct. 673, 21 L.Ed.2d 593 (1969). The trial judge did not err in concluding that the State had met its burden in establishing the chain of possession of the items. See State v. DiCarlo, 67 N.J. 321, 329 (1975); State v. Brown, supra, 99 N.J. at 27. Nor was there error in the admission of hairclips used by Rosemary which had been found in her pocketbook, so that they could be compared with those found in the car. While the pocketbook might have been excluded, this claimed error could not justify setting aside the verdict.

*59 IV
We find defendant's remaining contentions lacking in merit.
N.J.S.A. 2A:113-2 defines murder "perpetrated by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing" [emphasis supplied] as murder in the first degree. That the trial judge charged "lying in wait" was not reversible error in the circumstances of this case.
The State contends that defendant's course of conduct, reasonably inferable from the evidence, was tantamount to concealment within the meaning of the law. The removal of the door and window handles, for example, evidences concealment of defendant's purpose to entrap the victim. See State v. Tansimore, 3 N.J. 516, 537 (1950). A jury could find "lying in wait" despite the fact that an accused has revealed his physical presence to the victim immediately before the killing. Id. Traditionally, however, an intent to ambush by watchful waiting, concealment and secrecy is the essence of the term. People v. Merkouris, 46 Cal.2d 540, 297 P.2d 999 (Sup. Ct. 1956). However, a killing by "lying in wait" is merely a form of premeditated, deliberate and willful murder. See N.J.S.A. 2A:113-2. Here, the jury must have found defendant guilty of a deliberate, premeditated and willful murder. Thus we are satisfied that in the circumstances of this case the jury could not have been misled by the charge and, if there was error, it was harmless beyond a reasonable doubt. See Commonwealth v. Mondollo, 247 Pa. 526, 93 A. 612 (Sup. Ct. 1915); cf. Turner v. United States, 396 U.S. 398, 420, n. 41, 90 S.Ct. 642, 654, n. 41, 24 L.Ed.2d 610, 625, n. 41 (1970).
Defendant also contends that the search warrants issued in 1975 were not supported by affidavits establishing probable cause to believe that defendant was guilty of any of the murders for which evidence was sought. We disagree. Nor was it unreasonable to believe that evidence of such crimes may *60 have been concealed in defendant's home or vehicles. Moreover, not only has defendant failed to demonstrate any prejudice resulting from the searches, he has not even asserted that any of the seized items were admitted in evidence.
Finally, we find no merit to defendant's assertion that his conviction was against the weight of the evidence. A motion for a new trial on this ground was denied. We are satisfied that "the evidence, viewed in its entirety including the legitimate inferences therefrom [was] sufficient to enable a jury to find that the State's charge [was] established beyond a reasonable doubt." State v. Mayberry, supra, 52 N.J. at 436-437. Thus, we have no doubt that defendant's conviction was not a "manifest denial of justice under the law." State v. Sims, 65 N.J. 359, 374 (1974).
Affirmed.
NOTES
[1] We note defendant's further argument that State v. Brown, supra, was wrongly decided by our Supreme Court. There a conviction for second degree murder was upheld where the indictment charging first degree murder was returned more than five years after commission of the crime. Defendant's contention may be addressed to the Supreme Court, not this court, since we are bound by that decision. State v. Steffanelli, 133 N.J. Super. 512, 514 (App. Div. 1975). In any event, it is irrelevant where the accused is found guilty of first degree murder.
[2] The Sixth Amendment right to speedy trial is applicable to the states. Klopfer v. North Carolina, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967). The right is also protected by N.J. Const. (1947), Art. 1, par. 10.
[3] There is no merit to defendant's collateral estoppel claim that dismissal of the abduction charges bars the State from asserting that defendant was not prejudiced by the delay. See State v. Redinger, 64 N.J. 41, 45-46 (1973).
[4] Defendant's assertion that the trial judge did not caution the jury as to the proper consideration of this evidence (Evid. R. 6) is directly contradicted by the transcript of the judge's charge to the jury. Moreover the judge did not abuse his discretion in refusing to give a limiting instruction after the prosecutor's summation but before the jury was excused for the day. Finally, there is no merit to the complaint that the prosecutor committed prejudicial error in referring to this evidence in his summation. See State v. Slobodian, 120 N.J. Super. 68, 75 (App. Div.), certif. den. 62 N.J. 77 (1972).
[5] The trial judge made no finding as to who was responsible for counsel's absence, reasoning that defendant had no right to counsel under Kirby v. Illinois and State v. Earle, supra.