Stephen M. EPPERLY, Petitioner–
Appellant,

v.

E.L. BOOKER, Warden; Attorney
General of the Commonwealth of
Virginia, Respondents–Appellees.

No. 92–6128.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 3, 1993.

Decided June 15, 1993.

2

Edward Leigh Hogshire, Buck, Hogshire & Tereskerz, James Albert Trigg, Charlottesville, VA, argued, for petitioner-appellant.

Robert H. Anderson, III, Asst. Atty. Gen., Office of the Attorney General, Richmond, VA, argued (Mary Sue Terry, Atty. Gen. of

VA, Office of the Attorney General, on the brief), for respondents-appellees.

Before PHILLIPS, WILKINSON, and WILLIAMS, Circuit Judges.

## OPINION

PHILLIPS, Circuit Judge:

In 1980, Stephen M. Epperly was convicted by a Virginia jury of the first-degree murder of Gina Hall. He received a life sentence. Neither Hall's body nor a weapon was ever found; there were no eyewitnesses to the killing; and Epperly never confessed. Thus, the evidence of Hall's death and of Epperly's complicity in it was entirely circumstantial.

Epperly's conviction was affirmed on direct appeal. *Epperly v. Commonwealth,* 224 Va. 214, 294 S.E.2d 882 (1982). He exhausted his state post-conviction remedies, *Epperly v. Booker,* 235 Va. 35, 366 S.E.2d 62 (1988), and was denied relief on his federal habeas corpus petition by the United States District Court for the Western District of Virginia. On this appeal from the district court's order denying relief, we affirm.

### I

The facts of the case are recited in detail in *Epperly,* 294 S.E.2d at 885–90. We recapitulate the evidence leading to Epperly's conviction in the light most favorable to the state as the basis for considering his principal contention on appeal that the evidence was constitutionally insufficient under *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) to support his conviction.

Gina Hall was an eighteen-year old college student when she first met Epperly and his childhood friend Bill King at the Marriott Hotel in Blacksburg, Virginia on a Saturday night in June 1980. Hall had decided to go dancing to celebrate the conclusion of her final exams. She was a petite woman (5 ft. tall, 107 lbs.), in excellent physical and emotional health. Her relationships with family and friends were close and stable. She was conspicuously modest, however, and self-conscious about physical relationships due to extensive scarring from a childhood accident in which she was severely burned.

Before arriving at the Marriott that night, Epperly and King had stopped at a lake house owned by King's parents. King was responsible for keeping the lake house secure during his parents' absence, and the two men checked the house over thoroughly. Later that night, after dancing with Hall several times at the Marriott, Epperly borrowed the key to the lake house from King. He then left with Hall in the brown Chevrolet she had borrowed from her sister Dlana. According to King, Hall appeared "confused as to what car was going and exactly who was going" to the lake house. J.A. 211. She was last heard from when she telephoned Dlana between 1:00 and 1:30 a.m. sounding "very uneasy or out of character . . . very nervous." J.A. 144, 147. She told Dlana that she was "at the lake with a man named Steve." J.A. 508.

King and a woman named Robin Robinson arrived at the lake house between 3:45 and 4:00 a.m. J.A. 214. They saw the brown Chevrolet parked in the driveway in front of the garage. Realizing that their arrival was probably unexpected, King entered noisily through the kitchen, which was located on the middle level of the house, along with a bedroom and bathroom. A spiral staircase connected the kitchen with the lower level, which contained a recreation room, a utility room, and a bathroom. The recreation room opened onto the lake via sliding glass doors. The utility room contained a refrigerator, a table, and assorted odds and ends.

Epperly called up to King from the lower level. As the men spoke, Robinson looked down the spiral staircase and saw Epperly coming from the direction of the utility room, dressed only in pants and wiping his shoulders with a blue towel. J.A. 282. Neither King nor Robinson saw or heard Hall during this interchange, although Epperly told King "we're leaving . . . she's got to be getting back." J.A. 215–16.

King and Robinson then went down to the lake. After a few moments, Epperly called, "Bill, I'll see you later; we're leaving." King and Robinson did not see or hear the Chevrolet leave. *Id.* Less than ninety minutes

later, however, a police officer discovered the car parked near the New River with its trunk open. The car was still there at midnight, but because it had not been reported stolen the officer took no action.

Shortly after Epperly left, King and Robinson reentered the lake house via the downstairs recreation room. King stepped in a wet spot on the carpet several feet inside and to the left of the sliding glass doors. King did not examine the spot at the time or later on Sunday morning, when he and Robinson tidied up. Throughout their visit, they found the house to be in good order, although neither of them entered the utility room. J.A. 268, 310–11.

On Sunday afternoon, Epperly rejoined King at the lake house and spent what King thought was an unusually long time in the house while getting himself a drink. King also noticed that the spot on the carpet was still damp, J.A. 267, but again found the house to be in good order.

Because Hall had not returned by Sunday evening, her sister called friends to begin a search. They found the car by the river Monday afternoon. Although the car had been clean when Hall borrowed it, it had trash in it when they found it. Although Hall needed the driver's seat to be pulled all the way forward in order to drive, the seat was pushed all the way back. Epperly is six feet tall.

On Tuesday, King heard a "lookout" broadcast on the local radio station for a person matching Hall's description. He told Epperly to contact the police quickly so they wouldn't think he had anything to hide. Epperly asked King whom he had told about the matter and urged King to return and tell those friends "not to say anything, just kinda talk it down, not broadcast it." J.A. 228. The same day, Epperly asked another close friend, William Cranwell, whether Cranwell's brother, an attorney, might represent him. Epperly twice asked Cranwell to inquire of his brother "if there was anything that they could do to [Epperly] if they didn't find a body." J.A. 620. During that conversation, no one other than Epperly had initiated use of the term "body" to describe Gina Hall.

King then went to the police and, while accompanying them on a search of the lake house, found in it a broken ankle bracelet that matched the one that Hall was wearing when her sister had last seen her. When King asked Epperly whether he had killed Hall, he said, "I don't know anything about it. . . . We'll just have to wait and see." J.A. 233. He also said that he had engaged in a "little fondling" with Hall at the lake house. J.A. 278.

On close inspection, bloodstains and hairs were discovered in various locations around the lake house. The stains had been partially cleaned up, but sufficient residue remained for investigators to determine that several of them matched Hall's blood type. The stains were located primarily in two rooms. In the downstairs utility room, minute stains were scattered on items located in various parts of the room: a juice pitcher, dustpan, a table, a mattock, and a pair of brown shoes. Many of these stains were much smaller than those to be expected from a cut finger or similar accidental injury.

Larger bloodstains were found in the utility room, on the front of the refrigerator door and on the rubber seal on the interior side of the door. The stain on the front of the door had been partially cleaned up, but embedded in the stain were hairs similar to hairs found on Hall's curlers and fibers similar to samples taken from the recreation room carpet. A smeared stain was also found near the cleat of a golf shoe that was next to the refrigerator; a pubic hair removed from the cleat was inconsistent with Epperly's.

Bloodstains were also found in the recreation room, in two places. A bleached-out stain measuring some eighteen inches in diameter was found on the carpet, three or four feet inside and slightly to the left of the sliding glass door. J.A. 361. Another stain was found on the wooden leg of a chair to the left of the sliding glass door. Smaller stains were found on the light switch and faucet handle of the mid-level bathroom and on the light switch in the downstairs bathroom. Finally, minute stains were found on the walkway in front of the sliding glass doors and in the driveway near the garage door, where

Dlana's Chevrolet had been parked. J.A. 249.

According to King's parents, the house had been in good order when they left, and they could give no reason for the presence of any of the bloodstains or for the presence of the broken ankle bracelet. They also noticed that, in addition to items seized by police, several other things were missing when they returned to the house: a blue towel, a striped towel, and a bath mat from the mid-level bathroom; a quilt from the mid-level bedroom; a can of bathroom cleaner; and a roll of paper towels. King's mother later discovered the cap to the can of bathroom cleaner near a trash can in the utility room. The cap had upon it a head hair similar to Hall's. Neither the bath mat, the quilt, nor the paper towels were recovered.

Within several days of Hall's disappearance, however, searchers did find the missing bath towels, along with her clothes and the contents of her purse. All of these items were discovered either in the woods near the river where the Chevrolet had been found previously, or a short distance away. Hall's clothes were not ripped or torn. Like the towels and the trunk of the Chevrolet, however, the clothes were bloodstained. All of these items bore head hairs similar to Hall's and pubic hairs unlike Epperly's; Hall's pants also bore a head hair similar to Epperly's. All of the items, including Hall's underpants, also bore synthetic fibers similar to those of the carpet in the lake house.

At approximately the same time that searchers were discovering these items in the woods near the car, Epperly voluntarily came to the Virginia State police, stating that he had been with Hall on the night she disappeared. Epperly explained that Hall had driven him home from the lake house, and that he had given her directions back to her sister's apartment from his home. Her sister contended that she knew the area well and would not have needed directions. After Epperly was advised of his rights and accused of killing Hall he denied it, but was silent when the officer accused him a second time and agreed to "think about" how his cooperation might influence a jury. *Id.* at 510.

About ten days after Hall's disappearance, investigators also used a tracking dog, handled by John Preston, to search for evidence. To scent the dog, Officer Gerald Williams obtained a pair of Epperly's unlaundered underwear from his mother. For over an hour, the dog followed a trail from the place where the Chevrolet had been abandoned, pausing at each point where evidence had been discovered, and winding around for nearly two miles before walking up to Epperly's front door and stopping on his porch.

The dog scented Epperly on two other occasions as well—once to one of the towels in evidence, which officers had spread out with six similar towels in an auditorium, and once from Epperly's car, which was in the police station parking lot, into the station, and into the office where Epperly was being questioned. Epperly responded by putting his head into his arms and saying, "That's a damn good dog." J.A. 95.

Before trial, the prosecutor instructed at last three police officers involved in the case not to speak with Epperly's defense counsel, who obtained an order directing those officers to do so. The Virginia Supreme Court set aside the order insofar as it *required* the officers to speak with counsel, but noted that the officers could not be *prevented* from speaking with counsel. 366 S.E.2d at 66. Defense counsel failed, however, to interview the three officers or to renew the witness-gagging contention. One of the officers later testified against Epperly. During Epperly's subsequent habeas proceedings, the prosecutor admitted that even after the Supreme Court modified the order, he "may very well have" instructed the officers not to speak with defense counsel. J.A. 816.

Epperly presented no witnesses in his defense. At the close of the evidence, the jury was instructed on the elements of first- and second-degree murder. Neither side requested a voluntary manslaughter instruction. The jury convicted Epperly of first-degree murder, and he received a life sentence. As indicated, he then exhausted his state remedies by direct and collateral challenges to his conviction and was then denied relief on his federal habeas corpus petition

and took this appeal from the district court's order denying relief.

## II

Epperly raises three issues on appeal, each turning on a distinct aspect of the right to due process guaranteed him by the Fourteenth Amendment.

### A

Epperly first contends that his conviction was obtained in violation of his right to due process because, even viewing all the evidence in a light most favorable to the government, no rational jury could have found the essential elements of first-degree murder beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789. We disagree.

■ In Virginia, proof of a "willful, deliberate, and premeditated killing" sustains a conviction for murder in the first degree. Va.Code Ann. § 18.2–32 (1988 & Supp.1992). Thus, the elements of the crime are: "(1) a killing; (2) a reasoning process antecedent to the act of killing, resulting in the formation of a specific intent to kill; and (3) the performance of that act with malicious intent." *Rhodes v. Commonwealth*, 238 Va. 480, 384 S.E.2d 95, 98 (1989).

The question raised is a narrow one. Without, of course, conceding any complicity in Hall's death, Epperly does not argue that the evidence was constitutionally insufficient to support a reasonable inference that he killed her.[1] Instead, he argues that the evidence must leave any rational trier of fact with reasonable doubt regarding whether, after "a reasoning process antecedent to the act of killing," he formed the specific intent to kill.[2] *Id.*

■ The state need not show such intent to have existed "for any particular

length of time." *Smith v. Commonwealth*, 220 Va. 696, 261 S.E.2d 550, 553 (1980). Intent may—and often must—be proved circumstantially, through, for example, evidence pointing to a possible motive; a disparity in size and strength between defendant and victim; evidence of a prolonged assault; defendant's lack of remorse; and attempts to avoid detection, such as concealment of the body. *Epperly*, 294 S.E.2d at 892–93 (citations omitted).

■ In reviewing the evidence in a light most favorable to the government, *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789, we may not hold the state to disproving "every hypothesis except that of guilt beyond a reasonable doubt." *Id.* at 326, 99 S.Ct. at 2792. Indeed, "a federal habeas court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.*

Here, the jury was instructed on the elements of both first- and second-degree murder, and elected the former over the latter—and over acquittal. The question before us is whether under the *Jackson v. Virginia* review standard, that decision was irrational. That is, we must determine whether a jury rationally could have found on the evidence we have recapitulated that Epperly formed the specific intent to kill Hall after premeditation and deliberation.

In reviewing the evidentiary record we are mindful that "[c]ircumstances altogether inconclusive, if separately considered, may, by their number and joint operation ... be sufficient to constitute conclusive proof." *Stamper v. Muncie*, 944 F.2d 170, 174 (4th Cir.1991) (internal quotation marks and citations omitted). Epperly urges that, even in combination, the circumstances presented

---

1. Indeed, at oral argument he conceded that the evidence sufficed to warrant a conviction for second-degree murder, thus implicitly granting that the evidence rebuts a reasonable inference that Hall's death was accidental. *But see* Appellant's Br. 20.

2. We reject the state's contention that, by challenging the sufficiency of the evidence to establish specific intent, Epperly has waived any claim that the evidence does not support a finding of the premeditation and deliberation prerequisite, under Virginia law, to the formation of that intent. *See* Appellee's Br. 18 n. 4.

here offer no such proof. He insists that his conviction rests on no more than constitutionally impermissible speculation because the case lacks, *inter alia:* a body or a weapon, to prove the cause of Hall's death; a confession; more substantial evidence of a violent struggle, such as serious disorder either in the lake house or in Hall's clothing; or eyewitness testimony supporting some inference of a motive.

In support of this argument, Epperly correctly notes that of the generally comparable cases relied upon by the state none involves a conviction entered upon evidence lacking as many of the circumstantial indicia of guilt as does his. In *United States v. Russell*, for example, a panel of this court affirmed a first-degree murder conviction on direct appeal[3] where, as in the instant case, the victim's body was never recovered and defendant, the victim's husband, never confessed. 971 F.2d 1098 (4th Cir.1992). In *Russell*, however, the government had presented evidence of the defendant's ongoing abuse of his wife prior to her disappearance; his numer-

ous threats to kill her; a computer disk from his desk, containing a file labeled "murder," which outlined twenty-six steps for doing the deed; his purchase of a pistol two days before the victim disappeared; and his discussion of the most effective way to dispatch a victim with such a weapon.[4]

■ While, in fairness, it should be noted that there are a few decisions—mainly on direct appeals—affirming murder convictions on arguably even less evidence than was presented here,[5] there is, in the end, limited utility in canvassing for sufficiently like cases in conducting *Jackson* evidence-sufficiency review. It is, by definition, too intensely case-fact-specific an enterprise, *see, e.g., Wright v. West,* — U.S. —, —, 112 S.Ct. 2482, 2492, 120 L.Ed.2d 225 (1992), to be much aided by that process, and so we find the matter here.

■ On our independent assessment of the evidence in this case, we conclude that it sufficed under *Jackson's* stringent standard

---

**3.** Russell was convicted of murdering his wife on military property in violation of 18 U.S.C. § 1111(b).

**4.** The other generally comparable murder cases cited by the state are similarly distinguishable because the evidence included one or more of the following elements not present here: a body; a weapon; prior threats; a confession or strongly incriminating admissions; or eyewitness testimony establishing a motive. *See, e.g., Fitzgerald v. Thompson,* 943 F.2d 463 (4th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 1219, 117 L.Ed.2d 456 (1992) (body, eyewitness to threats and protracted sexual assault and stabbing); *Stamper v. Muncie,* 944 F.2d 170 (4th Cir.1991) (body, weapon, and motive); *Waye v. Townley,* 871 F.2d 18 (4th Cir.), *cert. denied,* 491 U.S. 910, 109 S.Ct. 3202, 105 L.Ed.2d 710 (1989) (body, weapon, and confession); *Thomerson v. Lockhart,* 835 F.2d 1257 (8th Cir.1987) (body evidencing extensive beating and torture, defendant's admission that attack took over an hour).

Other cases relied upon by the state involve convictions for charges other than murder, and therefore bear more tangentially on the question before us. *See United States v. Torcasio,* 959 F.2d 503 (4th Cir.1992) (extortion); *United States v. Celesia,* 945 F.2d 756 (4th Cir.1991) (fraud); *United States v. Fisher,* 912 F.2d 728 (4th Cir. 1990), *cert. denied,* — U.S. —, 111 S.Ct. 2019, 114 L.Ed.2d 106 (1991) (possession of cocaine with intent to distribute); *United States v. Hunt,* 749 F.2d 1078 (4th Cir.1984), *cert. denied,* 472 U.S. 1018, 105 S.Ct. 3479, 87 L.Ed.2d 614 (1985)

(predisposition to take bribes); *United States v. Hughes,* 716 F.2d 234 (4th Cir.1983) (kidnapping).

**5.** As the *Russell* panel noted, while there are few federal cases on point, the Third Circuit has surveyed state-court cases involving murder convictions based on evidence exclusive of a body, a confession, or a weapon. *Russell,* 971 F.2d at 1111 *(citing Virgin Islands v. Harris,* 938 F.2d 401, 411 n. 12 (3d Cir.1991)).

The landmark case appears to be *People v. Scott,* 176 Cal.App.2d 458, 1 Cal.Rptr. 600 (1959), *cert. denied,* 364 U.S. 471, 81 S.Ct. 245, 5 L.Ed.2d 222 (1960) (only trace of defendant's wife was glasses and dentures buried near their home; before her disappearance, defendant, who depended on victim's income, misrepresented her excellent physical and mental state to friends as having been very poor; defendant expressed satisfaction at her absence; defendant forged victim's name to access her sizeable estate, and left the country as murder investigation focused upon him). *See also, e.g., People v. Cullen,* 37 Cal.2d 614, 234 P.2d 1 (1951) (evidence that victim intended to leave defendant, her husband, along with defendant's admissions and bloodstains, established *corpus delicti* for first degree murder); *State v. Dudley,* 19 Ohio App.2d 14, 249 N.E.2d 536 (1969) (admissions, along with bloodstains found in area where victim was last seen, on victim's hat, car, and on crowbar in car, held sufficient to establish *corpus delicti* for assault with intent to kill).

to support Epperly's conviction of first-degree murder. Specifically, we hold the evidence sufficient to support the rational inferences that Epperly isolated Hall with him at the lake house in order to make sexual advances; that she resisted; that during the ensuing struggle, he removed her clothes with sufficient force to break her ankle bracelet; that, as the struggle escalated in duration and violence, he inflicted such injuries upon her as to cause not only the bloodstains on her clothes, but those spattered and smeared all about the utility room, along with the additional large bloodstain on the recreation room carpet and, some distance away, another on the chair leg; that those injuries caused Hall's death; and that, as Hall lay either dead or dying nearby, Epperly began a prompt and painstaking cover-up—even misrepresenting to King and Robinson, scarcely an hour or two after the attack, that Hall remained alive and well.

We further hold that the evidence supports a rational inference that, at some point during the struggle, Epperly formed, through premeditation and deliberation, the specific intent to kill. Four factors support this conclusion. Most probative is evidence pointing to the duration and violence of the struggle—one escalating from the forcible removal of clothes to a beating that left bloodstains spattered and smeared in various parts of two separate rooms of the lake house. Particularly in light of Epperly's significant size advantage over Hall, this evidence could support a rational inference that he pursued his attack over an expanse of space and period of time that created an opportunity for reflection.

Nor is it speculative to infer that by the time their protracted struggle was well underway, Epperly recognized that his actions could justify serious criminal charges against him. A subsequent rational inference follows: that Epperly's motive for killing Hall was to avoid the risk of prosecution by permanently silencing the only witness to the attack. *Epperly*, 294 S.E.2d at 892.

Moreover, while care must be taken not to inflate the probative value of post-event conduct for establishing a prior mental state, Epperly's actions rationally could be taken to reflect a capacity for premeditation, deliberation, and carefully intentional action. Particularly damaging are Epperly's statements to King, with whom Epperly had enjoyed a close bond since childhood and with whom, it is therefore reasonable to infer, Epperly would have displayed some emotional response to the news of Hall's disappearance, had he not been complicit in it. To the contrary, Epperly not only failed to express any concern or regret about the fact of Hall's disappearance when King informed him of the radio broadcast, but he actually urged King to tell other friends to keep quiet about his contact with Hall.[6] Later, when King asked him directly whether he had killed Hall, Epperly merely responded, "we'll just have to wait and see." Epperly's attempt to discover, through William Cranwell, whether the Commonwealth could prosecute him without a body in evidence further reinforces the impression of his capacity to detach himself from the tragedy through self-serving calculation.

Epperly argues that this chain of inferences is merely speculative, and therefore constitutionally insufficient under the rigorous test established in *Jackson*. In support, he cites *Austin v. United States*, 382 F.2d 129 (D.C.Cir.1967), *overruled on other grounds*, *United States v. Foster*, 783 F.2d 1082 (D.C.Cir.1986). As indicated, in conducting *Jackson* evidence-sufficiency review comparable cases are likely to be of minimal assistance, but because Epperly relies so strongly on *Austin*, we discuss it briefly.

The *Austin* majority overturned, on direct appeal, a first-degree murder conviction entered under the law of the District of Columbia. The evidence showed that the defen-

---

6. Consideration of a defendant's failure to express remorse for commission of a particular crime is arguably inconsistent with the presumption of innocence mandated by the common law and by the Constitution, *e.g.*, *Winship*, 397 U.S. at 361–64, 90 S.Ct. at 1071–73. Given the evidence that Epperly had spent a good portion of Saturday night dancing and socializing with Hall, however, a jury would be justified in considering his failure to express any regret or concern over the news of her disappearance, when informed of the fact by King, as indicating something other than mere boorishness.

dant: removed the victim's clothing; stabbed her at least 46 times (the final blow with such force as to leave the broken blade embedded in her skull); and, as she clung to life, dragged her to the river and threw her in. Over a heated dissent, the majority reversed, concluding that the evidence was equally probative of "a consuming frenzy or heat of passion" as of the premeditation and deliberation necessary to form a specific intent to kill. *Id.* 382 F.2d at 139.

We agree with the *Austin* court that, when faced with evidence justifying the reasonable inference of a defendant's sheer brutality, it is uniquely "the task and conscience of a judge to transcend emotional momentum with reflective analysis." *Id.* 382 F.2d at 138. But even assuming the accuracy of the majority's assessment of the evidence presented there, we agree with the state that applying similar reasoning in this case would impose upon state prosecutions a duty to disprove every hypothesis alternative to guilt beyond a reasonable doubt—an imposition clearly impermissible at least since *Jackson.*

B

Epperly next urges that the prosecutor violated his right to due process by suppressing material exculpatory evidence. *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963); *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383–84, 87 L.Ed.2d 481 (1985). The evidence was that the dog-tracking expert, John Preston, typically instructs prosecutors to prevent scent item contamination by ensuring that the item is secured in a sealed container and separated from anyone involved in the investigation.

It is uncontested that Officer Williams was involved in the investigation—indeed, he had searched areas near the river where evidence was discovered—before he obtained the scent item from Epperly's mother. At the state

habeas proceeding, however, Williams testified that he received the underwear in a paper bag and that, although he kept the bag with him for nine or ten hours, he never touched the scent item directly before giving it to Preston. Moreover, while Officer Williams was present at the outset of the tracking, the dog did not nuzzle him as would have been expected if Williams had contaminated the scent item. The two-mile trail traced by the dog also included places where Officer Williams had not walked when he had been searching for evidence. J.A. 660–61, 689–90; *Epperly,* 366 S.E.2d at 64–65. Consequently, at the close of those proceedings, the court found that Epperly failed to show that the track had been contaminated.

Epperly argues that (1) because the prosecutor failed to ensure that those instructions were followed, the dog-tracking was invalid from the outset and that (2) defense counsel's ignorance of these instructions at trial prevented him from undermining the dog-tracking evidence, which weighed dispositively against Epperly. He contends that either of these factors sufficiently "undermine[s] confidence in the outcome" of his trial to justify granting his habeas petition. *Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383–84 (internal quotation marks and citation omitted).[7] Epperly's *Brady* claim fails. Although the defense need not file a request for information in the prosecutor's possession in order to preserve a *Brady* claim, neither does the prosecutor have "a constitutional duty routinely to deliver his entire file to defense counsel." *United States v. Agurs,* 427 U.S. 97, 111, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976). The protocols governing dog-tracking were not possessed exclusively by the state. The evidence was "available from other sources" through the efforts of "a diligent defense attorney" through discovery, independent expert testimony, or cross-examination of Preston himself, *see* J.A. 46–68.

7. Apparently for the first time on this appeal, the state proposes that Epperly's *Brady* claim, and his prosecutorial misconduct claim discussed in Part II.C. *infra*, are barred by *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). The *Teague* defense appears nowhere in the government's pleadings, *see* Respondents' Brief in Support of Motion to Dismiss; Response to Memorandum in Opposition to Respondents' Motion to Dismiss; and Supplemental Brief in Support of Motion to Dismiss. Nor is it discussed in the Report and Recommendation of Magistrate Judge. J.A. 963–973. Consequently, we deem the defense waived. *Williams v. Dixon,* 961 F.2d 448, 456–59 (4th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 510, 121 L.Ed.2d 445 (1992).

*United States v. Wilson*, 901 F.2d 378, 380 (4th Cir.1990) (internal quotation marks and citations omitted). Epperly does not allege ineffective assistance of counsel in the failure of his trial attorneys successfully to pursue any of these avenues. "In situations such as this, where the exculpatory information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the *Brady* doctrine." *Id.* 901 F.2d at 381.

■ Even were *Brady* applicable here, we agree with the district court that the evidence in question was insufficiently material to warrant reversal, for two reasons. First, as discussed above, during the state habeas proceedings the state rebutted Epperly's factual claims that the track was contaminated. J.A. 967 n. 3. Because those findings of fact are fairly supported by the record, we defer to them. 28 U.S.C. § 2254(d)(8); *Sumner v. Mata*, 449 U.S. 539, 547, 101 S.Ct. 764, 769, 66 L.Ed.2d 722 (1980). Second, as our analysis of the evidence in Part II demonstrates, the dog-tracking provided a merely cumulative link between Epperly and Hall's death, rendering any nondisclosure immaterial. There was no constitutional violation in the prosecutor's alleged failures to disclose or to follow Preston's instructions.

### C

Finally, Epperly urges that he was denied due process through prosecutorial misconduct. It is conceded that the prosecutor instructed three police officers not to speak with defense counsel, and may have continued those instructions even after the Virginia Supreme Court upheld the portion of the trial court's order forbidding him to do so. J.A. 816. Although the Supreme Court has not ruled on the question, a number of circuits have held that such interference with witnesses violates the constitutional guarantee of a fair trial. *E.g., Kines v. Butterworth*, 669 F.2d 6, 9 (1st Cir.1981), *cert. denied*, 456 U.S. 980, 102 S.Ct. 2250, 72 L.Ed.2d 856 (1982); *Gregory v. United States*, 369 F.2d 185, 188 (D.C.Cir.1966); *see also United States v. Walton*, 602 F.2d 1176, 1179 (4th Cir.1979) ("A witness is not the exclusive property of either the government or a defendant; a defendant is entitled to have access to any prospective witness. . . .").

■ Epperly concedes that the Virginia Supreme Court held this claim to be procedurally barred by his failure to pursue it prior to appeal. This court is bound to defer to that finding of adequate and independent state grounds for rejecting the claim. *Harris v. Reed*, 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989). Epperly argues, however, that the prosecutor's misconduct constituted "a fundamental miscarriage of justice" warranting this court's consideration of the issue. *Engle v. Isaac*, 456 U.S. 107, 135, 102 S.Ct. 1558, 1576, 71 L.Ed.2d 783 (1982).

In order to support that claim, Epperly "must demonstrate cause and actual prejudice," *id.* at 129, 102 S.Ct. at 1572, or, lacking a showing of cause, he must show that his is "an extraordinary case, where a constitutional violation has probably resulted in a conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496, 106 S.Ct. 2639, 2649, 91 L.Ed.2d 397 (1986). In *Sawyer v. Whitley*, — U.S. —, —, 112 S.Ct. 2514, 2517, 120 L.Ed.2d 269 (1992), the Court held that a defendant must show by clear and convincing evidence that he is " 'actually innocent' of the death penalty." Epperly urges that *Sawyer* must be confined to alleged errors in sentencing, and that when the constitutionality of a conviction is at issue the defendant need only show that the subject of the claim would have caused a trier of fact to entertain a reasonable doubt of his guilt. *Kuhlmann v. Wilson*, 477 U.S. 436, 454 n. 17, 106 S.Ct. 2616, 2627 n. 17, 91 L.Ed.2d 364 (1986). Under either standard, Epperly's claim fails.

■ Again, Epperly does not allege ineffective assistance of counsel, and "the mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default." *Murray*, 477 U.S. at 486–87, 106 S.Ct. at 2644. Epperly also concedes that only one of the three officers offered significant testimony at trial. Officer Austin Hall had actively investigated the case from the

outset, and testified to several of Epperly's admissions.[8] Defense counsel admitted, however, that Officer Hall's testimony was not one of the surprises they encountered during trial. (In fact, counsel stated that the only surprises came from witnesses describing Epperly's post-incident attempts to avoid detection—evidence of which Epperly himself could have forewarned them, but did not.) J.A. 798, 802–803. Thus, the record fails to support a finding of cause and prejudice or manifest injustice necessary to warrant reversal on the basis of Epperly's final, defaulted claim.

## III

For the foregoing reasons, the decision of the district court is

*AFFIRMED.*

---

**8.** These admissions included (1) that Gina Hall had telephoned her sister from the lake house to say "that she was at the lake with a man named Steve," J.A. 508; (2) that Epperly "had kissed [Hall] some," J.A. 509; and (3) that, when accused of killing Hall and asked to consider how his cooperation might influence a jury, Epperly replied, "I'll think about it," J.A. 510.